**ORDERED PUBLISHED**

FILED

JAN 04 2011

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.  CC-10-1141-LyPaKi |
| ) | |
| EAST AIRPORT DEVELOPMENT, LLC,) | Bk. No.   ND 10-10634 RR |
| ) | |
|         Debtor.  ) | |
| _____) | |
| ) | |
| PACIFIC CAPITAL BANCORP, N.A.,) | |
| ) | **O P I N I O N** |
|         Appellant,  ) | |
| ) | |
| v.  ) | |
| ) | |
| EAST AIRPORT DEVELOPMENT, LLC,) | |
| ) | |
|         Appellee.    ) | |
| _____) | |

Argued and Submitted on November 17, 2010
at Pasadena, California

Filed - January 4, 2011

Appeal from the United States Bankruptcy Court
for the Central District of California

Hon. Robin L. Riblet, Bankruptcy Judge, Presiding.

_____

Appearances:  Andrew K. Alper of Frandzel Robins Bloom & Csato, L.C., argued for Appellant, Pacific Capital Bancorp, N.A.
William C. Beall of Beall & Burkhardt argued for Appellee, East Airport Development, LLC.

_____

Before:  LYNCH,[1] PAPPAS, and KIRSCHER, Bankruptcy Judges.

---

[1] Hon. Brian D. Lynch, Bankruptcy Judge for the Western District of Washington, sitting by designation.

LYNCH, Bankruptcy Judge:

Appellant, Pacific Capital Bancorp, N.A. ("Pacific Capital"), appeals an order of the bankruptcy court authorizing the sale of real property free and clear of Pacific Capital's lien pursuant to 11 U.S.C. § 363(f)[2] and the use of Pacific Capital's cash collateral pursuant to § 363(c)(2). We AFFIRM as to the § 363 sale, but REVERSE and REMAND with respect to the cash collateral portion of the bankruptcy court's order.

## I. Facts

Appellee, East Airport Development, LLC ("EAD" or "Debtor"), is a single asset real estate entity that owns a tract of real property in San Luis Obispo, California, consisting of 26 separate lots. In July 2006, EAD obtained a $9.7 million construction and development loan from Pacific Capital. The loan, due on January 10, 2008, was secured by a deed of trust against the real property. In July 2008, the parties refinanced the loan to approximately $10.6 million, due July 9, 2009. EAD defaulted and Pacific Capital began foreclosure proceedings, whereupon EAD filed a chapter 11 petition on February 10, 2010.

EAD, now Debtor, filed a motion in the bankruptcy court on February 25, 2010 to sell two lots free and clear of Pacific Capital's lien pursuant to § 363(f)(1), (2), and/or (5) and to use the proceeds of sale as cash collateral pursuant to § 363(c). In support of its motion, Debtor pointed to a prepetition release

---

[2] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-2-

price agreement between the parties, under which Pacific Capital was obligated to release individual lots from the lien of the deed of trust upon payment by EAD of specified release prices. Debtor argued the release price agreement was a "binding agreement that may be enforced by non-bankruptcy law, which would compel [Pacific Capital] to accept a money satisfaction," and also that Pacific Capital had consented to the sale of the lots. A spreadsheet setting forth the release prices was appended to the motion.  The motion stated Debtor's intention to use the proceeds of sale to pay Pacific Capital the release prices and use any surplus funds to pay other costs of the case (including, inter alia, completion of a sewer system).

Pacific Capital objected that it did not consent to the sale.  It also flatly denied the existence of the release price agreement, arguing that Debtor's declaration concerning the release prices was "unsupported by any admissible evidence whatsoever," that there was "no agreement," that any communications regarding the release prices were post-default "settlement negotiations," and that the spreadsheet violated the California parol evidence rule and statute of frauds.

Pacific Capital also opposed Debtor's use of its cash collateral on the grounds that Debtor's motion lacked sufficient detail and failed to comply with federal and local bankruptcy rules.  It argued the motion did not state the amount of debt or the extent of the use of its cash collateral, did not address adequate protection, and did not include a budget or appraisal of the property.

Debtor's reply argued that Pacific Capital was adequately

-3-

protected by an equity cushion.  Debtor also appended several documents in support of its original motion.  These included (1) a 2008 property appraisal prepared for the bank; (2) a July 24, 2009 letter from EAD to Pacific Capital requesting confirmation of the release prices; (3) an August 7, 2009 email from Pacific Capital to EAD attaching a copy of the updated release prices;[3] (4) a September 10, 2009 email from EAD to Pacific Capital confirming the release of a different lot pursuant to the release price agreement; and (5) a budget for the sewer system.  Pacific Capital objected to these documents on various evidentiary grounds.

After a hearing, the bankruptcy court granted Debtor's motion to sell the two lots.  It is unclear from the record whether the bankruptcy court approved the sale under § 363(f)(1), (2), or (5).  The written order found that Pacific Capital "agreed to allow sales of individual lots for specified release prices."  The bankruptcy court also made an oral finding, referenced in the written order, that "based upon the evidence . . . the bank and the Debtor had an agreement as to release prices."  In any event, the bankruptcy court found there was an

---

[3] First Bank (Pacific Capital's predecessor) had prepared the initial release prices based on a 2006 appraisal.  These were sent to EAD on August 17, 2006.  First Bank recalculated the release prices in June 2008, based upon a new 2008 appraisal.  The loan was refinanced sometime in July 2008, but the release prices were not integrated into the revised loan documents.  The loan went into default on July 9, 2009.  However, as noted, on August 7, 2009, Pacific Capital sent EAD the email confirming the revised release prices (i.e., after the loan was already in default).

agreement, and authorized the sale under at least one subsection of § 363(f).

The bankruptcy court also granted the cash collateral portion of Debtor's motion. It found that, based upon the appraisal prepared for the bank, Pacific Capital was adequately protected by an equity cushion. However, the appraisal was never actually admitted into evidence. At the hearing, the bankruptcy court questioned a "Mr. Burke" regarding the sewer system,[4] and engaged Debtor's counsel and Mr. Burke in a discussion of the budget, but did not swear in any witnesses or take formal testimony. Ultimately, in an order entered on April 19, 2010, the bankruptcy court authorized Debtor to pay the release prices and use any surplus funds to, inter alia, "construct the sewer improvement described in the motion and at the hearing." This timely appeal followed.

## II. Jurisdiction

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(M). We have jurisdiction pursuant to 28 U.S.C. § 158(c).[5]

---

[4] Mr. Burke, apparently, is one of Debtor's members.

[5] Pacific Capital argues this appeal is moot because "it is the Bank's understanding that at this time the sales are not in fact going to close." An appeal is moot if events have occurred that prevent an appellate court from granting effective relief. See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.), 293 B.R. 489, 493-94 (9th Cir. BAP 2003), citing First Fed. Bank v. Weinstein (In re Weinstein), 227 B.R. 284, 289 (9th Cir. BAP 1998). While the lot sales authorized by the bankruptcy court have apparently not closed, Pacific Capital has not submitted anything in the record to show that those sales will
(continued...)

**III. Issues**

1. Whether the bankruptcy court abused its discretion in authorizing Debtor to sell the real property free and clear of Pacific Capital's lien by paying the lien release price.

2. Whether the bankruptcy court erred in authorizing Debtor to use the surplus sale proceeds as cash collateral to pay costs of the case.

**IV. Standards of Review**

We apply the abuse of discretion standard when reviewing orders approving sales of property under § 363(f). Clear Channel Outdoor, Inc., v. Knupfer (In re PW, LLC), 391 B.R. 25, 32 (9th Cir. BAP 2008).[6] In applying the abuse of discretion standard, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009). If the correct legal rule was applied, we then consider whether the bankruptcy court's "application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. (internal quotation marks omitted). Only in the event that one of these three apply are we then able to find that the bankruptcy court abused its discretion. Id. When a

---

[5](...continued)
not be consummated given that Debtor has prevailed on appeal.

[6] As to the cash collateral portion of the bankruptcy court's order, the Panel need not express any view on the applicable standard of review because, as noted below, the bankruptcy court did not in the first instance determine whether the excess proceeds of sale were in fact cash collateral.

-6-

trial court uses extrinsic evidence to interpret a contract, the findings of fact are reviewed under the clearly erroneous standard, while the principles of contract law applied to those facts are reviewed de novo.  DP Aviation v. Smiths Indus. Aerospace & Def. Sys., Ltd., 268 F.3d 829, 836 (9th Cir. 2001).

## V. Discussion

We conclude the bankruptcy court did not abuse its discretion in authorizing the sale of Debtor's lots under § 363(f) and affirm the bankruptcy court on this point.  However, we are not convinced that the sale proceeds in excess of the release prices are cash collateral, as the bankruptcy court seems to have assumed.  We reverse and remand on this point, with directions to the bankruptcy court to determine whether the surplus proceeds are in fact cash collateral and, if they are, to conduct further appropriate proceedings.

### A.
### The bankruptcy court did not err in allowing the sale of Debtor's lots pursuant to 11 U.S.C. § 363(f).

We may affirm on any basis supported in the record.  United States v. Hemmen, 51 F.3d 883, 891 (9th Cir. 1995); Leavitt v. Soto (In re Leavitt), 209 B.R. 935, 940 (9th Cir. BAP 1997). While it is not clear whether the bankruptcy court was relying on § 363(f)(1), (2), and/or (5), we conclude that, on these facts, the sale was proper under § 363(f)(5).

### 1.
### The bankruptcy court did not clearly err in finding that a release price agreement existed between the parties.

As a preliminary matter, we first address Pacific Capital's

-7-

1 contention that the bankruptcy court erred in finding that a
2 release price agreement existed between the parties.  Debtor's
3 sale motion appended a declaration that the parties had a release
4 price agreement, as well as a spreadsheet setting forth the
5 release prices.  Pacific Capital's response included a
6 declaration that "there is no agreement."  Debtor's reply
7 appended two emails and one letter to prove the agreement: a July
8 24, 2009 letter from EAD to Pacific Capital requesting
9 confirmation of the release prices; an August 7, 2009 email from
10 Pacific Capital to EAD attaching the release price spreadsheet;
11 and a September 10, 2009 email from EAD to Pacific Capital
12 confirming the release of a different lot for the specified
13 release price.  Based on these documents, the bankruptcy court
14 found Pacific Capital "agreed to allow sales of individual lots
15 for specified release prices."  On this evidence, we conclude the
16 bankruptcy court did not clearly err in finding that a release
17 price agreement existed.

18    Pacific Capital makes four arguments as to why the
19 bankruptcy court erred: (1) the emails and letter proving the
20 agreement were appended to Debtor's reply and constitute "new
21 evidence" which it was not permitted to rebut; (2) the documents
22 were barred by the parol evidence rule; (3) the documents were
23 barred by the statute of frauds; and (4) the spreadsheet and
24 emails were "settlement negotiations" as defined in Federal Rule
25 of Evidence 408.  We do not find these arguments persuasive.

26    Pacific Capital cites Provenz v. Miller, 102 F.3d 1478 (9th
27 Cir. 1996) for the proposition that a party may not offer new
28 evidence with a reply and deprive the opposing party of an

-8-

1  opportunity to respond.  However, in Provenz, the Ninth Circuit
2  refused to find the district court abused its discretion in
3  denying the plaintiffs' motion for reconsideration based on an
4  ex-employee's declaration because the "plaintiffs learned about
5  this employee well before plaintiffs filed their opposition."
6  Id. at 1483.  Pacific Capital's own August 7, 2009 email is not
7  new evidence, particularly since it touches upon the agreement
8  that formed the basis for Debtor's sale motion.  In addition,
9  Pacific Capital was not surprised or prejudiced by the
10 introduction of EAD's letter requesting the updated release
11 prices, since Pacific Capital's email was written in response to
12 that letter.  Nor was the September 10, 2009 email from EAD
13 confirming the release of a different lot in any way "new."  It
14 strains reason to argue that a Pacific Capital document
15 confirming a transaction in the subject real property only came
16 to the bank's attention upon the filing of Debtor's reply.
17 Pacific Capital knew about these documents long before it opposed
18 Debtor's motion.
19     We also reject Pacific Capital's argument that the emails,
20 letters, and spreadsheet were barred by the California parol
21 evidence rule.  That rule states that a writing intended by the
22 parties to be the final embodiment of their agreement cannot be
23 modified by evidence of an earlier or contemporaneous agreement
24 that might add to, vary, or contradict the writing. Restatement
25 (First) of Contracts § 237 (1932); see also Cal. Civ. Proc. Code
26 § 1856.  "The rule bars consideration of events that took place
27 before, not after, the execution of the contract . . . ."
28 Gumport v. AT&T Techs., Inc. (In re Transcon Lines), 89 F.3d 559,

568 (9th Cir. 1996) (emphasis added).  Here, the construction loan refinancing documents were signed in July 2008, but the release price documents were exchanged throughout the later months of 2009 and post-date the integrated loan documents by at least a year.

Pacific Capital next argues the documents were barred by the statute of frauds because "no written agreement on release prices exists."  Pacific Capital is incorrect.  The statute of frauds declares certain contracts unenforceable if they are not committed to writing and signed by the party to be bound.  Restatement (Second) of Contracts § 110; see also Cal. Civ. Code § 1624.  An email sent by an agent of a corporation has been held to be a "writing" for purposes of the California statute of frauds.  Lamle v. Mattel, Inc., 394 F.3d 1355, 1362 (Fed. Cir. 2005).  On August 7, 2009, Pacific Capital's employee sent EAD an email attaching the spreadsheet of release prices.  This email is a "writing" by Pacific Capital's employee, the other emails and letters are clearly writings, and none of the documents are barred by the statute of frauds.

We finally reject Pacific Capital's argument that the documents are post-default "settlement negotiations" within the meaning of Federal Rule of Evidence 408.  Counsel for Pacific Capital argued before the Panel, and in the bankruptcy court, that the release price documents were merely part of an ongoing attempt to settle a post-default dispute.  However, no evidence exists in the record that the documents were exchanged as part of, or under the motivating influence of, compromise negotiations.  Rather, the record reveals that these documents

-10-

were ordinary business communications between the parties. See, e.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1373 (10th Cir. 1977) (communications that are "simply business communications" are not compromise negotiations).

**2.**

**The sale was proper under § 363(f)(5) because Pacific Capital could be compelled, in a legal or equitable proceeding, to release its lien upon payment of the release price.**

Sales free and clear are authorized under § 363(f). That section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

We are guided in our inquiry by the approach taken by this panel in Clear Channel Outdoor, Inc., v. Knupfer (In re PW, LLC), 391 B.R. 25 (9th Cir. BAP 2008). In Clear Channel, the Panel considered a bankruptcy court order approving, under § 363(f)(5), the sale of estate property on a credit bid submitted by a senior lienholder free and clear of a junior lien. The Panel held that the question was:

> whether there is an available type or form of legal or equitable proceeding in which a court could compel Clear Channel to release its lien for payment of an amount that was less than the full value of Clear Channel's claim. Neither the Trustee nor DB [Burbank, LLC] has directed us to any such proceeding under nonbankruptcy law, and the bankruptcy court made no

-11-

1  such finding.
2  391 B.R. at 45-46.
3  The Panel hypothesized about several contractual situations
4  in which a lienholder could be compelled to accept a money
5  satisfaction of its interest in exchange for releasing its lien,
6  including enforcement of a buy-out agreement among partners,
7  liquidated damages, or agreed damages in lieu of specific
8  performance, 391 B.R. at 43-44, before holding that subsection
9  (5) did not apply to the facts of the case. Id. at 46.
10 We conclude that the release price agreement in this case is
11 a contractual mechanism under which Pacific Capital could be
12 compelled, in a specific performance action, to accept a money
13 satisfaction of its interest for less than the full value of its
14 claim. For this reason, the sale was proper under § 363(f)(5)
15 and affirm the bankruptcy court's holding, which is a natural
16 extension of the Panel's Clear Channel decision.
17 Deed release provisions, also known as "partial release
18 provisions," are fully enforceable. See, e.g., Orlando Orange
19 Groves Co. v. Davenport, 77 F.2d 148, 150-51 (5th Cir. 1935)
20 (deed release provision gave mortgagor absolute right to release
21 of lien upon specified payment, which persisted until surrendered
22 by transfer or waiver, or defeated by mortgagor's conduct that
23 would make his insistence upon it inequitable); see also Magna
24 Development Co. v. Reed, 39 Cal. Rptr. 284 (Cal. Ct. App. 1964)
25 (deed release provision permitted release of any specific lot
26 from the lien of the trust deed upon payment of a stated
27 consideration).
28 Here, the bankruptcy court found that based on the evidence

1 before it, "the bank and the Debtor had an agreement as to
2 release prices," which provided for Pacific Capital to release
3 specific lots from the deed of trust upon payment by EAD (later,
4 Debtor) for stated consideration.  The bankruptcy court also
5 concluded, by necessary inference, that Debtor had fulfilled its
6 contractual obligations under the agreement and that Pacific
7 Capital was obligated to release its lien.  We do not think the
8 bankruptcy court erred in this regard, and sufficient evidence
9 exists to support its holding.
10     It is true that most release price agreements are the
11 subject of a detailed and formal writing, while this agreement
12 appears rather informal and was evidenced, as far as we can tell,
13 by only a few short writings.  However, this relative informality
14 is not fatal.  The bankruptcy court is entitled to construe the
15 agreement in the context of and in connection with the loan
16 documents, as well as the facts and circumstances of the case.
17 Courts seeking to construe release price agreements may give
18 consideration to the construction placed upon the agreement by
19 the actions of the parties.  See, e.g., United Real Estate &
20 Trust Co. v. Blochman, 244 F. 688, 691 (9th Cir. 1917) (release
21 price funds were given to the trustee "with the understanding"
22 among the parties that the lots would be released).  Here, the
23 parties acted as though the release price agreement was valid and
24 enforceable and, in fact, had already completed one such
25 transaction before EAD filed for bankruptcy.  On these facts,
26 Debtor had the right to require Pacific Capital to release its
27 lien on the two lots upon payment of the specified release
28 prices, even though Pacific Capital would not realize the full

amount of its claim.  More importantly, Debtor could enforce this right in a specific performance action on the contract.  For these reasons, the sale was proper under § 363(f)(5).

### 3.
### Pacific Capital did not consent to the sale for purposes of § 363(f)(2).

A bankruptcy trustee may sell property of the estate free and clear of a lien or other interest where the holder of the lien or interest consents.  11 U.S.C. § 363(f)(2).  However, to the extent the bankruptcy court relied on subsection (2) to authorize the sale of Debtor's property, we disagree.  Pacific Capital did not consent to the sale.  Rather, it objected in the bankruptcy proceeding.  We do not think that Pacific Capital's prepetition consent under the deed release agreement is consent for purposes of subsection (2).  The consent was not given in the context of a § 363 sale, nor was it given prepetition in anticipation of EAD's bankruptcy.  "The consent required is consent to a sale free of liens or interests, not merely consent to the sale of assets."  3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 363.06[3], 363-51 (16th ed., 2010).  A creditor's express refusal to consent ordinarily precludes a sale under § 363(f)(2).  Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mach. & Tool Co.), 816 F.2d 238, 241 (6th Cir. 1987) (§ 363(f)(2) did not permit sale of property free and clear of a lien where the creditor did not consent); see also In re Roberts, 249 B.R. 152, 155 (Bankr. W.D. Mich. 2000) (§ 363(f)(2) requires

unequivocal manifestation of the lienholder's affirmation).[7]

**B.**

**We reverse and remand that portion of the bankruptcy court's order with respect to Debtor's use of Pacific Capital's "cash collateral."**

As noted above, Pacific Capital argues that Debtor's motion to approve the use of cash collateral did not comply with the Bankruptcy Code and Rules. In contrast, and in support of the trial court's order, Debtor argues on appeal that any surplus funds above and beyond the release prices were not cash collateral at all because "once the sales were made and the release price paid, the Bank would have no further security interest in the excess funds." Debtor points out that the parties had completed a prior release, that Pacific Capital had not asserted any security interest in the excess funds, and that EAD had free use of the excess funds upon payment of the release prices. Thus, according to Debtor, the bankruptcy court did not need to conduct a cash collateral hearing at all.

The bankruptcy court appears to have assumed that the surplus funds were cash collateral, and conducted a hearing to that effect.[8] We cannot conclude on this record that the surplus

---

[7] Having concluded that subsection (5) provides a basis to affirm the bankruptcy court's holding, we leave for another day the question of whether, on these facts, the sale was proper under § 363(f)(1).

[8] The bankruptcy court approved Debtor's use of Pacific Capital's "cash collateral" based on a finding that the bank was adequately protected by an equity cushion. However, the appraisal supporting this finding was never placed into evidence nor did the appraiser testify at the hearing. Furthermore, in
(continued...)

-15-

funds were in fact Pacific Capital's cash collateral, or that a hearing was required. We reverse and remand for the bankruptcy court to determine what, if any, arrangement the parties had with respect to surplus funds. It is possible that, under the release price agreement, Debtor was entitled to use the funds as it desired, but that is a question for the bankruptcy court to answer.

### VI. Conclusion

We affirm the bankruptcy court's order authorizing the sale of lots under § 363(f). However, we reverse the bankruptcy court's order authorizing Debtor to use cash collateral, and remand this matter to the bankruptcy court to determine if the sale proceeds in excess of the release prices are indeed cash collateral, and if so, to conduct appropriate further proceedings, including a hearing, if necessary, to consider Debtor's request to use those funds.

---

[8](...continued)
granting the motion, the bankruptcy court appears to have relied on its conversation with Mr. Burke, even though he was never sworn in as a witness. Nonetheless, these deficiencies may be moot if the bankruptcy court determines the excess funds were not cash collateral.